IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ELENA BOTTS, on behalf of herself and
all others similarly situated,
*Plaintiff,*

v.

THE JOHNS HOPKINS UNIVERSITY,
*Defendant.*

Civil Action No. ELH-20-1335

**MEMORANDUM OPINION**

The COVID-19 global pandemic is the worst public health crisis that the world has experienced in 100 years.[1] Given the potentially severe consequences of contracting the virus, the pandemic produced unparalleled and exceptional circumstances impacting every aspect of our lives. Indeed, for a significant period of time, life as we have known it came to a halt. As mitigation efforts began to take hold in March 2020, many businesses and schools were forced to shut their doors, including Johns Hopkins University ("JHU," "Johns Hopkins," "Hopkins," or "University").

On or about March 11, 2020, in response to the public health crisis, Johns Hopkins announced the closure of its campus. And, like many institutions of higher learning, Johns Hopkins fashioned an alternative in teaching methodology, so that its students could continue their studies. In particular, Hopkins transitioned to online, remote learning.

---

[1] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19. *See Naming the Coronavirus Disease and the Virus that Causes It*, WORLD HEALTH ORG., https://bit.ly/2UMC6uW (last accessed June 15, 2020).

Through the summer and fall semesters of 2020, as the pandemic continued, the University's campus remained closed and its offerings continued to be virtual.  But, the University's tuition remained almost the same for most students.

The failure of JHU to remit and reduce tuition and fees, despite the move to online instruction, led plaintiff Elena Botts, a graduate student in JHU's School of International Studies ("SAIS"), to file suit against Hopkins.  *See* ECF 1 ("Complaint"); ECF 35 ("Amended Complaint").  Botts filed a putative class action against the University, on behalf of herself, undergraduate, and graduate students, complaining that Hopkins "has not apportioned the [financial] burden in an equitable manner . . . ."  ECF 35, ¶ 2.[2]  Botts complains that JHU has "retained all collected tuition, fees, and related payments since the Spring 2020 semester . . . ."  *Id.* ¶ 3.  She also alleges that Hopkins has "demanded" tuition and fees consistent with an "on-campus educational experience."  *Id.* Because of the suspension of in-person instruction, Botts seeks a partial refund of tuition and fees, claiming that the University "has not delivered the educational services, facilities, access and/or opportunities" that were "expected, were promised, contracted for and paid for. . . ."  *Id.*

The Amended Complaint contains three counts: breach of contract (Count I); unjust enrichment (Count II); and violations of the Maryland Consumer Protection Act ("MCPA"), Md. Code (2013 Repl. Vol., 2017 Supp.), §§ 13-101 *et seq.* of the Commercial Law Article ("C.L.") (Count III).  All three counts are asserted on behalf of all three classes: the "Spring 2020 Semester Class"; the "Summer 2020 Semester Class"; and the "Fall 2020 Semester and Beyond Class." Each

---

[2] Plaintiff is a citizen of Virginia who currently resides in Maine.  ECF 35, ¶ 7.  She asserts jurisdiction pursuant to 28 U.S.C. § 1332(d)(2)(A), "as modified by the Class Action Fairness Act of 2005" ("CAFA"), because at least one member of the class is a citizen of a different state than defendant, there are more than 100 members of the class, and the aggregate amount in controversy exceeds $5,000,000. ECF 35, ¶ 11; *see* 28 U.S.C. § 1337.

class includes undergraduate and graduate students who paid "tuition and/or fees for in-person educational services that Johns Hopkins did not provide" during the relevant semester. Plaintiff seeks damages in the form of "reimbursement, return, and disgorgement of the pro-rated portion of tuition and fees" paid for the Spring 2020 semester and the subsequent semesters of online learning, to account "for the diminished value of online learning." *Id.* ¶¶ 61, 62.

Johns Hopkins has moved to dismiss the Amended Complaint for failure to state a claim, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 42. The motion is supported by a memorandum of law. ECF 42-1 (collectively, the "Motion"). Plaintiff opposes the Motion. ECF 43 (the "Opposition"). Defendant has replied. ECF 44 (the "Reply").

Notably, this class action is one of many brought by students against colleges and universities, complaining about tuition and fees in light of the pandemic. Indeed, since the filing of the Reply, both sides have filed notices of supplemental authority, bringing to the Court's attention several recent decisions in some of these suits. *See* ECF 45 to ECF 56.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion as to Counts I and II and grant the Motion as to Count III.

## I.    Factual Background[3]

Founded in 1876, Johns Hopkins is a "private research university" centered in Baltimore with approximately 23,000 students in its graduate and undergraduate programs. ECF 35, ¶ 9. It

---

[3] In this Memorandum Opinion, I cite to the electronic pagination. The electronic pagination does not always correspond to the page numbers on the parties' written submissions.

Given the posture of the case, I must assume the truth of all factual allegations in the Complaint. *See Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). However, the Court may "take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015).

"boasts" a 140 acre "main campus" in Baltimore, with a wide variety of facilities, and also has "a substantial campus in the District of Columbia." *Id.* ¶ 15.  In its Motion, JHU points out that Johns Hopkins actually has a total of eleven campuses.  *See* ECF 42-1 at 7.[4]  The University has an endowment of approximately $6.28 billion dollars.  ECF 35, ¶ 9.

Plaintiff claims that Johns Hopkins "holds itself out through its website, educational and promotional literature, and through in-person activities such as campus tours, as being as [sic] an elite residential research university." *Id.* ¶ 15. And, when "students apply to become admitted to one of its graduate or undergraduate programs, such students have the expectation that they would have use of the campus and educational facilities" and continue "their studies through the attainment of a degree." *Id.* ¶¶ 16, 17.

Botts asserts that the admissions offer from Johns Hopkins "promises a live, in-person education at one" of the University's campuses. *Id.* ¶ 20. Further, the admissions letter provides that the student will be "'joining a vibrant campus'" where the student "'will learn alongside intellectually adventurous peers under the guidance of faculty who are experts in their fields….'" *Id.* In addition, the admissions offer states:  "'We can't wait to see what you will contribute to our campus….'" *Id.*

According to plaintiff, the JHU website "expressly promises that students will receive an in-person, on-campus educational experience." *Id.* ¶ 22. It states: "'Admitted first year students will receive additional information about their enrollment at Johns Hopkins in April. This will include details about housing, dining, academic advising, registration, [o]rientation and more.'" *Id.*

---

[4] In its Motion, JHU includes many factual assertions that are not included in the Amended Complaint.  These facts are not properly considered at this juncture.  But, the number of campuses is not material to the issues here.

Further, plaintiff alleges that Johns Hopkins touts "the value of its campus life";  "its research capabilities"; "its various libraries"; residing on campus; the "significance of 'Experiential Learning'"; the "importance of in-person interactions"; "the benefits of in-person extracurricular activities"; and participation in "student clubs." *Id.* ¶¶ 40, 42-49. For instance, the website states: "'Living on campus is an indispensable piece of the Hopkins undergraduate experience.'" *Id.* ¶ 44 (quoting *Housing & Dining*, JOHNS HOPKINS UNIVERSITY (May 21, 2020) https://www.jhu.edu/life/housing-dining/). As to "Experiential Learning," the website claims that, "'[t]hrough study treks, practicum projects, staff rides, career treks, and internships, you will gain practical, hands-on experience.'" *Id.* ¶ 45 (quoting *Experiential Learning*, SAIS (May 27, 2020), https://sais.jhu.edu/student-experience/experiential-learning). And, with respect to one of JHU's on-campus libraries, the website proclaims: "'Mason Library provides services, collections, and technologies that support the Johns Hopkins SAIS community. From one-on-one consultations with librarians to spaces for academic collaboration, the library is a hub of activity for students.'" *Id.* ¶ 49 (quoting *Our Libraries*, SAIS (May 27, 2020), https://sais.jhu.edu/faculty-research/our-libraries (May 27, 2020)).

Moreover, Botts alleges that Johns Hopkins "*requires* students to be on campus in order to be enrolled." *Id.* ¶ 41 (emphasis in original). For example, the student handbook for SAIS provides: "Students who are not on campus during the first two weeks of the semester may be required to [move] enrollment to a future term." *Id.*

The Spring 2020 semester began on January 15, 2020, "on-campus and in-person as usual, and as expected." *Id.* ¶ 24. The semester was scheduled to end on May 12, 2020. *Id.*  However, about halfway through the semester, on March 5, 2020, Maryland Governor Lawrence ("Larry") Hogan, Jr. declared a state of emergency and catastrophic health emergency to control and prevent

5

the spread of COVID-19 in Maryland. *See* State of Maryland, *Declaration of State of Emergency and Existence of Catastrophic Health Emergency – COVID-19* (Mar. 5, 2020). A week later, on March 11, 2020, the World Health Organization declared COVID-19 a global pandemic. *See Rolling Updates on Coronavirus Disease (COVID-19),* WORLD HEALTH ORG.*,* https://www.who.int/emergencies/diseases/novel-coronavirus-2019/events-as-they-happen. And, on March 13, 2020, President Donald Trump declared a national emergency due to the novel coronavirus. *See* President Donald J. Trump, *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (Mar. 13, 2020), https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronarirus-disease-covid-19-outbreak/.

On March 11, 2020, Johns Hopkins emailed its students, faculty, and staff, announcing that "because of the global COVID-19 pandemic, all in-person classes for the Spring 2020 semester would be suspended and replaced with online classes by March 23, 2020." *Id.* ¶ 27. Students were asked to vacate on-campus housing by March 15, 2020. *Id.*

Virtual instruction continued through the remainder of the Spring 2020 semester, as well as the 2020 Summer session. *Id.* ¶ 30. On June 20, 2020, Johns Hopkins announced that it would resume in-person classes in the Fall of 2020. *Id.* ¶ 32. But, a month later, on July 20, 2020, as the pandemic continued, the University "abruptly announced that all classes for the SAIS student[s] would be held online for the" Fall of 2020. *Id.* ¶ 34. Shortly thereafter, on August 6, 2020, JHU announced that undergraduate classes would also be held online for the Fall 2020 semester. *Id.*[5]

---

[5] Although many businesses and schools reopened for a period of time during the Summer of 2020, by the Fall of 2020, many were again subject to closure or substantial restrictions, due to a virulent resurgence of the virus.

Botts paid approximately $26,600 in tuition and fees to Johns Hopkins for the Spring 2020 semester; $14,490 in tuition and fees for the Summer 2020 session; and $32,886 for the Fall 2020 semester. *Id.* ¶ 8. According to plaintiff, when she paid the tuition and fees, she "entered into an express or implied contract" with the University; in exchange for tuition and fees, the University "would provide live, in-person and on-campus instruction as it had historically provided and access to its physical resources such as libraries and laboratories and other campus facilities." *Id.* ¶ 19.

Plaintiff claims that the quality of the Johns Hopkins education significantly diminished after the shift to remote learning. *Id.* ¶¶ 3-6, 39, 51. According to plaintiff, the "online learning options Defendant currently offers, though consistent with safety measures…simply cannot provide the academic experiences Defendant itself touts as its signatures." *Id.* ¶ 51; *see id.* ¶ 39 (citing Eric P. Bettinger et al., *Virtual Classrooms: How Online College Courses Affect Student Success*, AMERICAN ECONOMIC REVIEW). For example, she posits that many of the online classes were "not even 'live' virtual instruction, but instead [were] merely recorded lectures for students to watch at their leisure." *Id.* ¶ 50.

The disparity between in-person and online education is illustrated, according to plaintiff, by the "vast price difference in Johns Hopkins's in-person, on-campus programs versus Johns Hopkins's own online learning program." *Id.* ¶ 53. For example, the University's Masters in Business Administration ("MBA") program charges $62,500 in tuition for the in-person program, but only $41,175 for the "equivalent credits for its online program." *Id.* ¶ 54. And, plaintiff contends, Johns Hopkins "implicitly admitted that students were harmed by the switch to 'online learning' when it announced a limited 10% reduction in undergraduate tuition for the Fall 2020 Semester." *Id.* ¶ 55.

However, that same reduction in tuition was not offered to graduate students. *Id.* ¶ 56. Rather, Johns Hopkins offered a $1,000 "'Covid-19 Hardship Tuition Credit'" for SAIS students for the 2020-2021 academic year. *Id.* ¶ 57. According to plaintiff, this "amounted to less than a 2% reduction in tuition for" SAIS students. *Id.* In fact, Johns Hopkins increased the tuition for SAIS by 3% for the 2020-2021 academic year. *Id.* ¶ 58.

In sum, plaintiff posits that the announcement suspending in-person classes "effectively breached or terminated the contract Johns Hopkins had with each and every student and tuition provider and other class member, who had paid for the opportunity to participate in academic life on Johns Hopkins on-campus and in-person." *Id.* ¶ 28. But, plaintiff adds, Johns Hopkins has "refused to properly and proportionally refund tuition and related expenses…." *Id.* ¶ 36.[6]

## II.     Standard of Review

### A.  Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."

Whether a complaint states a claim for relief is assessed by reference to the pleading

---

[6] At this juncture, the record does not reflect whether Hopkins's expenses were static, increased, or decreased due to the pandemic.  For example, the faculty presumably was paid, and the University probably incurred costs to switch to online learning.  Even if JHU incurred costs, however, it is not clear whether those expenses can be passed to the students.

requirements of Fed. R. Civ. P. 8(a)(2).  It provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) (citation omitted) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ."); *see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."  *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10 (2014) (per curiam).  But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.  *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation.  *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).  If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.  *Twombly*, 550 U.S. at 555.  "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief.  *Iqbal*, 556 U.S. at 678.  Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of

action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely." *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint" and must "draw all reasonable inferences [from those facts] in favor of the plaintiff." *E.I. du Pont de Nemours & Co.*, 637 F.3d at 440 (citations omitted); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015); *Kendall v. Balcerzak*, 650 F.3d 515, 522 (4th Cir. 2011), *cert. denied*, 565 U.S. 943 (2011). But, a court is not required to accept legal conclusions drawn from the facts. *See Papasan v. Allain*, 478 U.S. 265, 286 (1986); *Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy sought. *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses'" through a Rule 12(b)(6) motion. *Edwards*, 178 F.3d at 243 (quoting *Republican Party v. Martin,* 980 F.2d 943, 952 (4th Cir. 1992)). However, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)." *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009). Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary

10

to the affirmative defense 'clearly appear[ ] *on the face of the complaint.*'" *Goodman,* 494 F.3d at 464 (quoting *Forst,* 4 F.3d at 250) (emphasis added in *Goodman*).

## B.  Choice of Law

The parties assume, without discussion, that Maryland law applies to plaintiff's claims, which are based on Maryland law.  "When choosing the applicable state substantive law while exercising diversity or supplemental jurisdiction, a federal district court applies the choice of law rules of the forum state." *Ground Zero Museum Workshop v. Wilson*, 813 F. Supp. 2d 678, 696 (D. Md. 2011); *see Colgan Air, Inc. v. Raytheon Aircraft Co.*, 507 F.3d 270, 275 (4th Cir. 2007); *Baker v. Antwerpen Motorcars, Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).  Where, as here, "the underlying basis for CAFA jurisdiction is diversity, the forum state's choice of law rules apply." *Wright v. Linebarger Googan Blair & Sampson, Ltd. Liab. P'ship*, 782 F. Supp. 2d 593, 601 (W.D. Tenn. 2011).

"[I]nterpretation of private contracts is ordinarily a question of state law." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989); *accord James v. Circuit City Stores, Inc.*, 370 F.3d 417, 421-22 (4th Cir. 2004).  Because Maryland is the forum state, I must apply Maryland substantive law, including its choice of law rules, to determine which state's substantive law applies to the agreement.  *Small v. WellDyne, Inc*., 927 F.3d 169, 173 n.3 (4th Cir. 2019); *Francis v. Allstate Ins. Co*., 709 F.3d 362, 369 (4th Cir. 2013); *CACI Int'l, Inc. v. St. Paul Fire & Marine Ins. Co*., 566 F.3d 150, 154 (4th Cir. 2009).

As to the contract claim, Maryland applies the law of the state in which the contract was formed ("*lex loci contractus*"), unless the parties to the contract agreed to be bound by the law of another state.  *See, e.g. Cunningham v. Feinberg*, 441 Md. 310, 326, 107 A.3d 1194, 1204 (2015); *Erie Ins. Exch. v. Heffernan*, 399 Md. 598, 618, 925 A.2d 636, 648 (2007); *Am. Motorists Ins. Co.*

*v. ARTRA Grp., Inc.*, 338 Md. 560, 573, 659 A.2d 1295, 1301 (1995); *TIG Ins. Co. v. Monongahela Power Co.*, 209 Md. App. 146, 161, 58 A.3d 497, 507 (2012), *aff'd*, 437 Md. 372, 86 A.3d 1245 (2014). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Tr., Inc. v. WHE Assocs.*, 142 Md. App. 476, 490, 790 A.2d 720, 728 (2002) (citing *Commercial Union Ins. Co. v. Porter Hayden Co.*, 116 Md. App. 605, 672, 698 A.2d 1167, 1200 (1997), *cert. denied*, 348 Md. 205, 703 A.2d 147 (1997)). The parties have not specified precisely where this last act occurred.

Plaintiff is a citizen of Virginia who currently resides in Maine. ECF 35, ¶ 7. Johns Hopkins is "headquartered" in Maryland, according to plaintiff. *Id.* ¶ 12. But, SAIS is located in Washington, D.C. *See* JOHNS HOPKINS SCHOOL OF INTERNATIONAL ADVANCED STUDIES, https://sais.jhu.edu/about-us (last accessed Apr. 12, 2021). Nevertheless, plaintiff alleges that "many of the acts and transactions giving rise to this action occurred" in Maryland. ECF 35, ¶ 12.

However, because the parties assume that Maryland law applies, I shall apply Maryland law with respect to plaintiff's claims.

### III.    Discussion

Johns Hopkins has moved to dismiss the Amended Complaint on four grounds. First, it contends that all of plaintiff's claims should be dismissed under the educational malpractice doctrine because "they improperly challenge the qualitative merits of virtual versus in-person learning." ECF 42-1 at 8. Second, Johns Hopkins argues that plaintiff has failed to state a breach of contract claim because she has not sufficiently identified the basis for any contractual right to in-person instruction. *Id.* at 9. Next, it alleges that Botts fails to plead any plausible basis for unjust enrichment. *Id.* JHU notes, for example, that Botts does not allege that the University "saved money, and thus has profited, by moving classes to a virtual setting." *Id.* at 21-22. And, JHU

moves to dismiss the suit under the MCPA because Botts does not allege that Johns Hopkins engaged in fraud or misrepresentation. *Id.* at 9.

Plaintiff asserts, *inter alia*, that Hopkins argues "against a straw man complaint." ECF 43 at 13. She maintains that the University presents challenges to non-existent claims. *Id.* According to Botts, Hopkins "seeks dismissal of a pleading it wishes to oppose" and not the one that was "actually filed in this case." *Id.* at 7. For example, Botts contends that JHU "improperly tries to recast [her] claims sounding in contract as tort claims." *Id.* at 10.

I shall address the arguments, in turn.

### A. The Educational Malpractice Doctrine

The educational malpractice doctrine applies when a court is "'asked to evaluate the course of instruction… [and] is similarly called upon to review the soundness of the method of teaching that has been adopted by an educational institution.'" *Ross v. Creighton Univ.*, 957 F.2d 410, 416 (7th Cir. 1992) (quoting *Paladino v. Adelphi Univ.*, 89 A.D.2d 85, 90, 454 N.Y.S.2d 868, 872 (1982)) (alterations in *Creighton Univ.*). It precludes a court from adjudicating claims regarding the quality of education provided by an educational institution. *Hunter v. Bd. of Educ. of Montgomery Cty.*, 292 Md. 481, 487, 439 A.2d 582, 582 (1982); *see also Gurbani v. Johns Hopkins Health Systems Corp.*, 237 Md. App. 261, 293, 185 A.3d 760, 779 (2018) (noting that there is "a broader body of case law that overwhelmingly favors judicial deference to academic decisions at all levels of education").

As a threshold matter, JHU maintains that plaintiff's claims are barred by the educational malpractice doctrine. ECF 42-1 at 11-16. It contends that the doctrine applies here because plaintiff challenges "the qualitative merits of virtual versus in-person learning." *Id.* at 8. Dismissal is appropriate, argues Hopkins, because plaintiff's claims improperly require "a judicial evaluation

13

of the quality and value of the University's academic programs." ECF 44 at 6.  Hopkins maintains that "how and what to teach are core pedagogical concerns that fall squarely within [the U]niversity's judgment and discretion."  ECF 42-1 at 8.

Botts disputes the contention that her suit implicates the educational malpractice doctrine. ECF 43 at 10-12.  She argues that she has not sued for "education negligence," *id.* at 10, or to "change the 'quality' of her education." *Id.* at 11.  Rather, she is seeking money damages for defendant's "breach of certain promises," *id.* at 10, and because Hopkins "foisted the entire financial burden onto" the students.  *Id.* at 11.

In *Hunter*, the Maryland Court of Appeals considered a parents' claim against a school district for failing to evaluate and educate their child.  The court noted that "so called 'educational malpractice' claims" have been "unanimously rejected" in other jurisdictions based on "considerations of public policy[.]" *Id.* at 487, 429 A.2d 582 (collecting cases). Upon review of those cases, the court concluded that "an award of money damages…represents a singularly inappropriate remedy for asserted errors in the educational process." *Id.* In the court's view, recognition of such an action "would in effect position the courts of this State as overseers of both the day-to-day operation of our educational process as well as the formulation of its governing policies." *Id.* at 488, 439 A.2d 582. And, the court was reluctant to impose such a responsibility on the judiciary. *Id.*

The Amended Complaint alleges that online education is "inferior" and does "not have the same value" as in-person education. *See, e.g.*, ECF 35, ¶¶ 4, 5, 59, 60. However, plaintiff's claims do not require a judicial evaluation of the "quality" of the program or the method of teaching at Johns Hopkins. *See Creighton Univ.*, 957 F.2d at 416 (citing *Hunter*, 292 Md. at 489 n.5, 439 A.2d at 586, and other cases). Rather, plaintiff's claims are grounded in contract—*i.e.*, whether Hopkins

14

made a promise to provide in-person educational services and whether it subsequently breached that promise. The Amended Complaint focuses at least partially on assertions and representations made by Johns Hopkins in "official statements and publications," which serve as the basis of the alleged contractual relationship between the University and plaintiff. Ascertaining the meaning of these materials is an exercise in contract interpretation, which does not require an "improper judicial foray[] into evaluations" of the academic judgments of educational professionals. *Metzner v. Quinnipiac Univ.*, 3:20-cv-00784, 2021 WL 1146922, at *6 (D. Conn. Mar. 25, 2021); *see also id.* at *8 (In this case, "the promise alleged to have been breached is not a promise to provide an effective or adequate education but instead to provide an in-person education.").

To be sure, courts generally have no business intruding in matters "such as course content, homework load, and grading policy," which are "core university concerns." *Lovelace v. Se. Mass. Univ.*, 793 F.2d 419, 426 (1st Cir. 1986). At this stage, however, adjudication of plaintiff's claims does not require an inquiry into the academic quality of the remote education provided by Hopkins. Nor do plaintiff's claims implicate the University's academic freedom "to determine for itself on academic grounds who may teach, what may be taught, how it shall be taught, and who may be admitted to study." *Regents of Univ. of Cal. v. Bakke*, 438 U.S. 265, 312 (1978) (quoting *Sweezy v. New Hampshire*, 354 U.S. 234, 263 (1957) (Frankfurter, J., concurring)). In other words, the decision to deliver instruction via remote technology was not a decision made on "academic grounds." Instead, it was an administrative decision made to address the exigencies of the COVID-19 crisis.

Numerous courts analyzing similar claims lodged against educational institutions that shifted to online learning during the pandemic have also rejected requests for dismissal based on deference to educational institutions. *See, e.g.*, *Oyoque v. DePaul Univ.*, No. 20 C 3431, 2021 WL

15

679231, at *2 (N.D. Ill. Feb. 21, 2021) ("Though portions of the plaintiffs' allegations can be read as talking about the value of online instruction, at its core the complaint's focus is breach of contract—whether DePaul provided the specific services it allegedly promised."); *Hassan v. Fordham Univ.*, __ F. Supp. 3d __, 2021 WL 293255, at *2 (S.D.N.Y. Jan. 28, 2021) ("The Court holds that Plaintiff's claims are not barred by the educational malpractice doctrine, because they are sufficiently grounded in whether an alleged promise for educational services was made and breached."); *Doe v. Emory Univ.*, No. 1:20-CV-2002-TWT, 2021 WL 358391, at *4 (N.D. Ga. Jan. 22, 2021) ("Because judicial intervention here would not require continuous judicial intrusion, and because a court can properly and justly evaluate the dispute, this Court declines the Defendant's invitation to defer to its decision-making without assessing the merits of the Plaintiffs' claims."); *McCarthy v. Loyola Marymount Univ.*, 2:20-cv-04668-SB (JEMx), 2021 WL 268242, at *3 (C.D. Cal. Jan. 8, 2021) (concluding that the "decision to suddenly shift to online education can hardly be characterized as an 'academic decision' within the meaning of that [educational malpractice] doctrine"); *Hiatt v. Brigham Young Univ.*, No. 1:20-CV-00100 (TS), 2021 WL 66298, at *3 (D. Utah Jan. 7, 2021) ("Plaintiff is not asking the Court to interfere in BYU's academic or pedagogical choices by requiring BYU to provide in-person education or change its methods of education. Rather, Plaintiff is asking for a refund of tuition and/or mandatory fees for the breach of contract alleged. The requested relief does not require the Court to ask BYU to change its operations or otherwise interfere in BYU's academic decisions, so this argument does not support granting the Motion."); *Ford v. Rensselaer Polytechnic Inst.*, No. 1:20-CV-470, 2020 WL 7389155, at *5-6 (N.D.N.Y. Dec. 16, 2020) (concluding that plaintiffs' claims "seeking recompense from their tuition payments" were not barred); *Saroya v. Univ. of the Pac.*, No. 5:20-cv-03196-EJD, 2020 WL 7013598, at *3–5 (N.D. Cal. Nov. 27, 2020) (declining to dismiss based

on educational malpractice bar because claim was not that the university "failed to provide students with an adequate education, but that it failed to provide certain services as promised").

In sum, from the face of the Amended Complaint, it is plausible that plaintiff's claims may be resolved without a subjective assessment of educational quality.  Therefore, at this juncture the educational malpractice doctrine does not bar plaintiff's claims. However, this determination does not foreclose the Court from reassessing, at a later time, whether resolution of plaintiff's claims requires the Court "to enter the classroom" to evaluate "whether a course conducted remotely was less valuable than one conducted in person—and if so, by how much ...." *Hassan*, 2021 WL 293255, at *4 (quotation marks and citation omitted).

### B. Breach of Contract

### 1.

Plaintiff asserts a claim of breach of contract.  She contends that the parties entered into a "binding contract," either express or implied, by way of each "admission offer" and accepted "through payment of tuition and fees."  ECF 35, ¶ 72.

In general, a contract is defined as "a promise or set of promises for breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." Richard A. Lord, 1 *Williston on Contracts* § 1:1, at 2-3 (4th ed. 1990); *accord* Restatement (Second) Contracts § 1, at 5 (1981); *see also Maslow v. Vanguri*, 168 Md. App. 298, 321, 896 A.2d 408, 421-22, *cert. denied*, 393 Md. 478, 903 A.2d 416 (2006).  "'A contract is formed when an unrevoked offer made by one person is accepted by another.'"  *Cty. Comm'rs for Carroll Cty. v. Forty W. Builders, Inc.*, 178 Md. App. 328, 377, 941 A.2d 1181, 1209 (2008) (quoting *Prince George's County v. Silverman*, 58 Md. App. 41, 57, 472 A.2d 104, 112 (1984)).

Here, plaintiff claims breach of contract.  In Maryland, the elements of a claim for breach of contract are "'contractual obligation, breach, and damages.'"  *Parkway 1046, LLC v. U.S. Home Corp.,* 961 F.3d 301, 307 (4th Cir. 2020) (quoting *Kumar v. Dhanda,* 198 Md. App. 337, 344, 17 A.3d 744, 749 (2011)).  Thus, to prevail, plaintiff "must prove that the defendant owed the plaintiff a contractual obligation and that the defendant breached that obligation." *Taylor v. NationsBank, N.A.,* 365 Md. 166, 175, 776 A.2d 645, 651 (2001).

A contract may be oral or written.  *See Cty. Comm'rs of Caroline Cty. v. Roland Dashiell & Sons, Inc.*, 358 Md. 83, 94, 747 A.2d 600, 606 (2000).  A contract may also be express or implied.  "'An express contract has been defined as an actual agreement of the parties, the terms of which are openly uttered or declared at the time of making it, being stated in distinct and explicit language, either orally or in writing.'"  *Maryland Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 706, 114 A.3d 676, 688 (2015) (quoting *Dashiell*, 358 Md. at 94, 747 A.2d at 606).

An implied-in-fact contract, or an "implied contract," is "an agreement which legitimately can be inferred from intention of the parties as evidenced by the circumstances and the ordinary course of dealing and the common understanding of men."  *Maryland Cas. Co.*, 442 Md. at 706, 114 A.3d at 688. An implied-in-fact contract "is 'inferred from conduct of parties and arises where plaintiff, without being requested to do so, renders services under circumstances indicating that he expects to be paid therefore, and defendant, knowing such circumstances, avails himself of [the] benefit of those services.'"  *Dashiell*, 358 Md. at 95 n.6, 747 A.2d at 606 n.6 (citation omitted); *see Mogavero v. Silverstein*, 142 Md. App. 259, 275, 790 A.2d 43, 52 (2002) ("An implied-in-fact contract is a 'true contract' and 'means that the parties had a contract that can be seen in their conduct rather than in an explicit set of words.'"); *Slick v. Reinecker*, 154 Md. App. 312, 318, 839 A.2d 784, 787 (2003) ("'The term [implied in fact contract] only means that the parties had a

18

contract that can be seen in their conduct rather than in an explicit set of words.'") (quoting *Mass Transit Admin. v. Granite Constr. Co.*, 57 Md. App. 766, 774, 471 A.2d 1121 (1984)) (emphasis omitted) (bracketed words added in *Slick*).

Thus, an implied-in-fact contract "'*refers to that class of obligations which arises from mutual agreement and intent to promise*, when the agreement and promise have *simply not been expressed in words.* Despite the fact that no words of promise or agreement have been used, *such transactions are nevertheless true contracts*, and may properly be called inferred contracts or contracts implied in fact.'" *Mohiuddin v. Doctors Billing & Management Solutions, Inc.*, 196 Md. App. 439, 448, 9 A.3d 859, 865 (2010) (quoting 1 Richard A. Lord, *Williston on Contracts*, § 1.5, pp. 20-21 (1990)) (emphasis in *Mohiuddin*); *see State Construction Corp. v. Slone Assocs., Inc.*, 385 F. Supp. 3d 449, 462-63 (D. Md. 2019) (observing that "an implied-in-fact contract is, for all intents and purposes, an 'actual contract'"). "Recovery on a contract implied in fact . . . is based on the amount that the parties intended as the contract price or, if that amount is unexpressed, the fair market value of the plaintiff's services." *Mogavero*, 142 Md. App. at 276, 790 A.2d at 53.

To determine whether there is an enforceable contract, courts begin the analysis by considering "the essential prerequisite of mutual assent to the formation of a contract . . . ." *Falls Garden Condo. Ass'n, Inc. v. Falls Homeowners Ass'n, Inc.*, 441 Md. 290, 302, 107 A.3d 1183, 1189 (2015); *see Mitchell v. AARP*, 140 Md. App. 102, 116, 779 A.2d 1061, 1069 (2001) ("An essential element with respect to the formation of a contract is 'a manifestation of agreement or mutual assent by the parties to the terms thereof; in other words, to establish a contract the minds of the parties must be in agreement as to its terms.'" (citations omitted)).  Mutual assent is an integral component of every contract. *See, e.g.*, *Joseph Saveri Law Firm Inc. v. Michael E. Criden, P.A.*, 759 F. App'x 170, 173 (4th Cir. 2019) (recognizing as a "bedrock principle of law" that an

offeree must accept an offer to form a contract); *Cochran v. Norkunas*, 398 Md. 1, 14, 919 A.2d 700, 708 (2007); *Advance Telecom Process LLC v. DSFederal, Inc.*, 224 Md. App. 164, 177, 119 A.3d 175, 183 (2015). "Manifestation of mutual assent includes two issues: (1) intent to be bound, and (2) definiteness of terms." *Cochran*, 398 Md. at 14, 919 A.2d at 708.

Whether oral or written, a contract must express with certainty the nature and extent of the parties' obligations and the essential terms of the agreement. *RRC Northeast, LLC v. BAA Maryland, Inc.*, 413 Md. 638, 655, 994 A.2d 430, 440 (2010); *Forty W. Builders, Inc.*, 178 Md. App. at 377-78, 941 A.2d at 1209-10; *see Canaras v. Lift Truck Services*, 272 Md. 337, 346, 322 A.2d 866, 871 (1974). If an agreement omits an important term, or is otherwise too vague or indefinite with respect to an essential term, it is not enforceable. *Mogavero*, 142 Md. App. at 272, 790 A.2d at 51; *see L & L Corp. v. Ammendale*, 248 Md. 380, 385, 236 A.2d 734, 737 (1967); *Robinson v. GEO Licensing Co., L.L.C.*, 173 F.Supp.2d 419, 423 (D. Md. 2001); *see also Schloss v. Davis*, 213 Md. 119, 123, 131 A.2d 287, 290 (1956) (stating that a "contract may be so vague and uncertain as to price or amount as to be unenforceable").

### 2.

"Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" *Polek v. J.P. Morgan Chase Bank, N.A.*, 424 Md. 333, 362, 36 A.3d 399, 416 (2012) (citation omitted; emphasis in *Polek*). In other words, "[i]t is the parties' agreement that ultimately determines whether there has been a breach." *Mathis v. Hargrove,* 166 Md. App. 286, 318-19, 888 A.2d 377, 396 (2005).

As to the terms of the contract, under Maryland law, the interpretation of a contract is "ordinarily a question of law for the court." *Grimes v. Gouldmann*, 232 Md. App. 230, 235, 157

A.3d 331, 335 (2017); *see Spacesaver Sys., Inc. v. Adam*, 440 Md. 1, 7, 98 A.3d 264, 268 (2014);

*Myers v. Kayhoe*, 391 Md. 188, 198, 892 A.2d 520, 526 (2006); *Towson Univ. v. Conte*, 384 Md.

68, 78, 862 A.2d 941, 946 (2004); *Lema v. Bank of Am., N.A.*, 375 Md. 625, 641, 826 A.2d 504,

513 (2003); *Under Armour, Inc. v. Ziger/Snead, LLP*, 232 Md. App. 548, 552, 158 A.3d 1134,

1136 (2017).  This includes the determination of whether a contract is ambiguous.  *Sy-Lene of*

*Wash., Inc. v. Starwood Urban Retail II, LLC*, 376 Md. 157, 163, 829 A.2d 540, 544 (2003).

Notably, "[t]he relationship between a student and a private university is largely contractual

in nature."  *Harwood v. Johns Hopkins Univ.*, 130 Md. App. 476, 483, 747 A.2d 205, 209, *cert.*

*denied*, 360 Md. 486, 759 A.2d 231 (2000).  Courts applying Maryland law have recognized a

contractual relationship between students and private universities. *See Streeter v. Walden Univ.,*

*LLC*, CCB-16-3460, 2017 WL 6035253, at *2 (D. Md. Dec. 5, 2017), *aff'd*, 730 F. App'x 163 (4th

Cir. 2018); *Showell v. Capella University Inc.*, GLR-16-3761, 2017 WL 11451382, at *3 (D. Md.

Sept. 29, 2017).  As Judge Quarles said:  "'When a student is duly admitted by a private university

there is an implied contract between the student and the university that, if the student complies

with the terms prescribed by the university, the student will obtain a degree.'"  *Sirpal v. Wang*,

WDQ-12-0365, 2013 WL 5234256, at *3 n.9 (D. Md. Sept. 16, 2013) (quoting *Harwood*, 130 Md.

at 483, 747 A.2d at 209).  The "terms of the contract are contained in the brochures, course offering

bulletins, and other official statements, policies and publications of a university…." *Harwood*, 130

Md. App. at 483, 747 A.2d at 209 (internal citations omitted).

Nevertheless, courts are "mindful" of their "lack of competence in assessing academic

judgments," and generally do not "'interfere in the operations of colleges and universities.'"

*Onawola v. Johns Hopkins University*, 412 F. Supp. 2d 529, 532 (D. Md. 2006) (quoting *Harwood*,

130 Md. App. at 483, 747 A.2d at 209); *see Huang v. Bd. of Governors of the Univ. of N.C.*, 902

F.2d 1134, 1142 (4th Cir. 1990) ("When judges are asked to review the substance of a genuinely academic decision ... they should show great respect for the faculty's professional judgment."); *Valente v. Univ. of Dayton*, 438 F. App'x 381, 384 (6th Cir. 2011) ("Contracts for private education have unique qualities and must be construed to allow the institution's governing body to meet its educational and doctrinal responsibilities."). The "'policy concerns that preclude a cause of action for educational malpractice apply with equal force to bar a breach of contract claim attacking the general quality of an education.'" *Gurbani*, 237 Md. App. at 293, 185 A.3d at 779 (quoting *Creighton Univ.*, 957 F.2d at 416).

However, "as with any Maryland breach of contract claim, a student plausibly states a claim under Rule 12(b)(6) if she states 'facts showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" *Showell*, 2017 WL 11451382, at *3 (quoting *Polek*, 424 Md. at 362, 36 A.3d at 416) (emphasis in *Showell*). And, Botts asserts that she has alleged the formation of either an express or implied contract based on JHU's offer of admission and her payment of the required tuition and fees. ECF 35, ¶ 74; ECF 43 at 16. As part of that contract, "as conveyed to students through the admission offer and numerous other materials sent to them," Johns Hopkins "promised to provide in-person, on-campus education services, including in-person instruction and access to on campus resources [sic]…" ECF 35, ¶ 75.  Moreover, Botts alleges that Johns Hopkins breached that promise when it transitioned to virtual programming in March 2020 but failed to provide adequate tuition refunds. *Id.* ¶ 77.

To be clear, the question here is not whether Johns Hopkins was justified in closing its campus due to an unforeseen and unprecedented global pandemic.  Nor is it appropriate to consider the costs incurred by JHU to shift to online teaching.  Rather, the question is whether plaintiff has

alleged a contract and, if so, whether JHU breached by closing the campus and transitioning to virtual instruction, without adjusting tuition and fees.

**3.**

The first question is whether plaintiff has adequately alleged that Johns Hopkins was contractually obligated to provide plaintiff with in-person instruction and an on-campus experience.   In the Amended Complaint, plaintiff points to "many official statements and publications from the university" as the source of the University's promise to provide in-person instruction. ECF 43 at 14 (citing ECF 35, ¶¶ 20, 22).

In particular, the Amended Complaint highlights passages from the defendant's website that describe the campus's physical beauty and the abundance of facilities and amenities on campus, including access to laboratories and libraries, as well as the opportunities for interaction with faculty and students, experiential learning, and extracurricular activities that are part of the on-campus experience. ECF 35, ¶¶ 20, 4-49. Plaintiff observes that the admissions letter clearly provides that the admitted student will be "joining a vibrant campus" where the student "will learn alongside intellectually adventurous peers under the guidance of faculty who are experts in their fields…." *Id.* ¶ 20.

JHU seems to concede the creation of a contractual relationship between plaintiff and Johns Hopkins. ECF 42-1 at 16.  But, it contends that plaintiff fails to "allege any identifiable contractual promise to provide in-person education." *Id.*

There is authority that suggests these promotional statements, on their own, may not amount to an express, enforceable promise to provide *in-person* education. *See Espejo v. Cornell Univ.*, 3:20-CV-467 (MAD/ML), 2021 WL 810159, at *4 (N.D.N.Y. Mar. 3, 2021) ("These statements, 'which seem to be intended to inform potential students of available amenities, do not

amount to a 'contractually-enforceable promise to provide them irrespective of changing or unanticipated circumstances.'") (quoting *Oyoque*, 2021 WL 679231, at *4); *In re Columbia Tuition Refund Action*, __ F. Supp. 3d __, 2021 WL 790638, at *4 (S.D.N.Y. Feb. 26, 2021) (noting that "the references in Columbia's marketing materials to 'the on-campus experience' are not sufficient to support a [contract] claim. Many of these references are mere 'opinion or puffery' that is 'too vague to be enforced as a contract'"); *Emory Univ.*, 2021 WL 358391, at *5 ("While these statements might conjure images of the typical academic, residential, and social opportunities enjoyed by college students, these statements cannot be deemed a legal offer. Instead, these promotional statements are essential advertising materials, which do not constitute offers to form express contracts...."); *cf. Univ. of Baltimore v. Iz*, 123 Md. App. 135, 716 A.2d 1107, 1125 (1998) ("'[N]ot every statement made in a personnel handbook or other publication will rise to the level of an enforceable covenant.... "[G]eneral statements of policy are no more than that and do not meet the contractual requirements of an offer."'") (quoting *Staggs v. Blue Cross of Maryland, Inc.*, 61 Md. App. 381, 392, 486 A.2d 798, *cert. denied*, 303 Md. 295, 493 A.2d 349 (1985) (internal citation omitted)) (alterations in *Iz*).

As another court has recognized, "this is not a typical contract situation where there is an express document with delineated terms that a plaintiff can reference." *Salerno v. Fla. S. Coll.*, 488 F. Supp. 3d 1211, 1218 (M.D. Fla. 2020).[7]  But, even if JHU's "promotional statements do not constitute a binding [or express] promise of in-person education," they "can help define the scope of an implied contract." *Emory Univ.*, 2021 WL 358391, at *6.  As mentioned, the materials cited in the Amended Complaint tout the University's on-campus resources and facilities.

_____

[7] The Court has not been provided with or alerted to the enrollment agreement, which might have a Force Majeure clause that pertains to circumstances such as a pandemic.

Construed in the light most favorable to plaintiff, these statements "imply in-person participation." *Doe v. Bradley Univ.*, No. 20-1264, 2020 WL 763419, at *3 (C.D. Ill. Dec. 22, 2020); *see McCarthy*, 2021 WL 268242, at *4 (finding that statements touting benefits of in-person teaching and on-campus experience sufficient to establish an implied contract).

And, plaintiff has alleged more than the mere "aspirational" language and promotional statements from the Johns Hopkins website. She explains that, at the outset of the semester, the University actually "*requires* students to be on campus in order to be enrolled." ECF 43 at 15 (emphasis in original) (citing ECF 35, ¶ 41).   The Amended Complaint quotes the Student Handbook for SAIS, which said: "Students who are not on campus during the first two weeks of the semester may be required to postpone enrollment to a future term."  ECF 35, ¶ 41.  In addition, the Handbook stated, *id.*:  "Phd pre-dissertation students *must be present on campus* and working full time towards the fulfillment of the degree."  (Emphasis added).

Further, Botts alleges that Johns Hopkins charges students significantly less for online degree programs. *Id.* ¶¶ 53, 54. And, plaintiff explains that the customary and historic practice of the University was to offer on-campus and in-person educational services. *Id.* ¶¶ 16, 19. Consistent with that practice, when the semester began in January 2020, classes were held in-person and the campus was open to the students. *Id.* ¶ 24.

Defendant argues that cases finding implied contracts have been "outside of the unique educational context . . . ."  ECF 44 at 15.  JHU asserts that the parties' course of conduct does not evidence an implied agreement in this context.  *Id.*  Moreover, Hopkins contends that any implied contract must be read narrowly. According to JHU, "in an 'implied contract between the student and the university,' the only obligation of the University is 'that, if the student complies with the

terms prescribed by the university, the student will obtain a degree.'" *Id.* (quoting *Harwood*, 130 Md. App. at 483, 747 A.2d at 209).

However, JHU's reading of *Harwood* is too narrow, and is contradicted by relevant case law. First, in *Harwood*, as indicated, the Maryland Court of Special Appeals expressly noted that the "terms of the contract are contained in the brochures, course offering bulletins, and other official statements, policies and publications of a university…." 130 Md. App. at 483, 747 A.2d at 209. In other words, the award of a degree is not necessarily a university's only obligation with respect to its students. Rather, its obligations will depend on the terms contained in the school's brochures and statements.

Moreover, courts in other districts, interpreting a principle identical to the one set out in *Harwood*, have not constrained themselves to finding that a university's only obligation in an implied contract with a student is the provision of a degree. *See, e.g., Espejo*, 2021 WL 810159, at *5; *Bergeron v. Rochester Inst. of Tech.*, No. 20-CV-6283 (CJS), 2020 WL 7486682, at *7-8 (W.D.N.Y. Dec. 18, 2020); *Ford*, 2020 WL 7389155. In *Bergeron*, 2020 WL 7486682, for example, the federal court declined to dismiss a breach of contract claim against Rochester Institute of Technology ("RIT") for closing its campus without adequate tuition refunds.  It said: "'Under New York law, an implied contract is formed when a university accepted a student for enrollment: if the student complies with the terms prescribed by the university and completes the required courses, the university must award him a degree. The terms of the implied contract are contained in the university's bulletins, circulars and regulations made available to the student.'" *Id.* at *5 (quoting *Papelino v. Albany Coll. of Pharmacy*, 633 F.3d 81, 93 (2d Cir. 2011) (internal citations and quotation marks omitted)).

In analyzing the breach of contract claim, the *Bergeron* Court observed that plaintiffs identified "a multitude of promises made by RIT regarding the benefits of its in-person, on-campus program, including opportunities to work directly with faculty in their labs, vibrant and diverse campus life, access to superior technology, and robust on-campus support." *Id.* at *7-8. In addition, the court noted that RIT offered two different programs—an "in-person, hands-on program" and "fully online distance learning programs"—that were mutually exclusive and for which RIT charged significantly different tuition rates. *Id.* at *1. The court concluded that the facts were sufficient to allege a promise for in-person instruction and to survive a motion to dismiss. *Id.* at *8.

*Ford*, 2020 WL 7389155, is also instructive.  There, Rennselaer Polytechnic Institute ("RPI") operated a program that relied on a "time based clustering and residential commons program," which required students to be on campus for specific portions of the program. *See id.* at *4. Based on the claims in its catalog and allegations regarding the in-person program, the court concluded that a promise for in-person instruction was plausible. *Id.* at *4-5.

According to the material cited in the Amended Complaint, Johns Hopkins may not have made as many assertions with respect to in-person education as were made by RPI or RIT. But, like the students at RPI, Johns Hopkins requires some students to be on campus during certain parts of the semester. *See* ECF 35, ¶ 41. And, similar to RIT, Johns Hopkins offered both in-person and fully virtual learning programs and charged higher tuition rates for its in-person programs. ECF 35, ¶¶ 53, 54; *see Espejo*, 2021 WL 810159, at *5 ("Certainly, Cornell has not made as many assertions with respect to in-person education as RPI did [as recounted in *Ford*], nor is there any indication that Cornell requires students to reside on campus for any part of their education.

However, both this case and *Ford* include an explicit statement from the university indicating that the education for which Plaintiffs paid tuition includes an on-campus component.").

Other judges of this court, considering analogous suits under Maryland law, have dismissed the students' contract claims. But, those cases are readily distinguishable. *See Student "A" v. Hogan*, __F. Supp. 3d__, 2021 WL 119083 (D. Md. Jan. 13, 2021); *Student "C" v. Anne Arundel Cty. Cmty. Coll.*, __F. Supp. 3d__, 2021 WL 82919 (D. Md. Jan. 11, 2021); *Student "B" v. Howard Cty. Cmty. Coll.*, __F. Supp. 3d __, 2021 WL 75139 (D. Md. Jan. 8, 2021). In *Student "A"*, for example, the plaintiffs sued public universities that qualified for the protection of sovereign immunity.

In Maryland, the State waives sovereign immunity in contract actions only where the agreement at issue "is a written contract that an official or employee executed for the State." Md. Code. (2014 Repl. Vol.), § 12-201 of the State Government Article ("S.G."); *see Stern v. Bd. of Regents, Univ. Sys. of Md.*, 380 Md. 691, 701, 846 A.2d 996, 1012-13 (2004) (explaining that this provision is to be construed narrowly "in order to avoid weakening the doctrine of sovereign immunity by judicial fiat"); *ARA Health Services, Inc. v. Dep't of Public Safety and Correctional Services*, 344 Md. 85, 91-92, 685 A.2d 435, 438 (1996) (per curiam). The *Student "A"* Court concluded that the schools' advertisements for in-person services could not be construed as contracts that satisfied the waiver. 2021 WL 119083, at *3-5; *see Student "C"*, 2021 WL 82919, at *5 (finding that "sovereign immunity bars Plaintiff's claim unless it is based on a signed writing or a specific refund policy"); *Student "B"*, 2021 WL 75139, at *4 (same).

In contrast with the public educational institutions at issue in the District of Maryland cases cited above, Johns Hopkins is a private educational institution.  Therefore, it is not protected by

28

sovereign immunity. Thus, plaintiff need not allege the existence of a written contract to succeed with regard to her breach of contract claim.

Moreover, numerous courts outside of this district have denied motions to dismiss in nearly identical breach of contract actions, finding that the facts were sufficient to allege a contract for in-person instruction, based on language from university handbooks, catalogs, and brochures. *See, e.g., Nguyen v. Stephens Institute*, __ F. Supp. 3d __, 2021 WL 1186341, at *4 (N.D. Cal. Mar. 30, 2021) (finding statements in school's marketing, advertisements, and other public representations, coupled with statements in "Enrollment Agreement," collectively formed implied contract to provide in-person instruction); *Patel v. Univ. of Vermont*, No. 5:20-cv-61, 2021 WL 1049980, at *8-9 (D. Vt. Mar. 15, 2021) (finding that "statements in the course catalogue and on the website could reasonably be interpreted by a fact finder to form a promise that Plaintiffs' academic courses would be in-person and that Plaintiffs would receive the benefits of on-campus (and adjacent) facilities and activities"); *Emory*, 2021 WL 358391, at *6 ("Defendant's customary practice and the Plaintiffs' payment of tuition represent sufficient factual allegations of mutual assent to an implied contract."); *Rhodes v. Embry-Riddle Aeronautical Univ., Inc.*, __ F. Supp. 3d __, 2021 WL 140708, at *5-6 (M.D. Fla. Jan. 14, 2021) (finding plaintiffs adequately pleaded breach of contract, noting that "[s]urely those on-campus students are paying for *something*") (emphasis in original); *Bahrani v. Ne. Univ.*, No. 20-10946-RGS, 2020 WL 7774292, at *2 (D. Mass. Dec. 30, 2020) (holding that further factual development was needed to determine whether plaintiffs had a contractual right to in-person instruction); *Chong et al. v Northeastern Univ.*, No. CV 20-10844-RGS, 2020 WL 7338499, at *3 (D. Mass. Dec. 14, 2020) ("Drawing all inferences in plaintiffs' favor, the court cannot, as a matter of law, say that no student who read these statements could have reasonably expected ... entitle[ment] to in-person instruction."); *Gibson v. Lynn Univ., Inc.*,

No. 20-CIV-81173-RAR, 2020 WL 7024463, at *3 (S.D. Fla. Nov. 29, 2020) (rejecting university's argument that complaint lacked allegations of contractual provisions requiring university to provide in-person education or requiring a refund of fees; reasoning that "[t]hroughout the Amended Complaint, Plaintiff cites to portions of Lynn's publications and policies that suggest courses would be conducted in-person and students would have access to campus facilities and activities"); *Saroya*, 2020 WL 7013598, at *5 (allegations of statements in university's course catalog were sufficient to state a claim for breach of an implied-in-fact contract to deliver courses in-person); *Rosado*, 2020 WL 6438684 (allegations of university documents referring to in-person classes and amenities were sufficient to establish implied contract for in-person instruction); *Salerno*, 488 F. Supp. 3d at 1217-18 (college publications "clearly implied that courses would be conducted in-person" and touted college's on-campus "resources and facilities"; such statements were sufficient to establish an implied contract).

In its Reply, Hopkins points to language in the student handbook to support its argument that the Court should afford deference to the University with regard to its decision to transition to virtual learning. ECF 44 at 16-17. The SAIS Handbook, for example, states: "'The policies and procedures detailed in The Red Book are subject to revision at any time, and changes are communicated to students only through their assigned JHU email addresses.'" *Id.* at 17. According to JHU, this "explicit disclaimer" defeats plaintiff's contention that there was an enforceable contract for in-person instruction. *Id.*

Ultimately, Hopkins may be able to establish that the parties contemplated that the students would bear the risk of a University closure caused by a crisis, such as a global pandemic. But, my ruling must be based on the allegations; questions as to other terms of the alleged contract are not before me at this stage.  These are matters that require further factual development.

There are, of course, cases that have decided otherwise. *See*, *e.g.*, *Abuelhawa v. Santa Clara Univ.*, 20-CV-04045, 2021 WL 1176689, at *6 (N.D. Cal. Mar. 29, 2021) (granting motion to dismiss, finding plaintiffs did not plead a specific promise to provide in person instruction); *Hassan*, 2021 WL 293255, at *6 (concluding that "Fordham's alleged statements do not rise to the level of a specific promise to provide in-person educational services" ); *Lindner v. Occidental Coll.*, No. 20-CV-08481-JFW, 2020 WL 7350212, at *1 (C.D. Cal. Dec. 11, 2020) (finding plaintiffs "failed to identify any specific language in the 2019–2020 Catalog or any other publication from Occidental that promises in-person instruction").   But, these cases are distinguishable.

For instance, as evidence of a contract for in-person instruction, the plaintiffs in *Hassan*, 2021 WL 293255, pointed to publications listing available courses that detailed the times and locations of those classes; a search filter on the course catalog which allowed students to search for courses by instruction mode; and an attendance policy which required students to attend every class for each course. *Id.* at *5. The *Hassan* Court concluded that the statements did not constitute a specific promise to provide in-person instruction. *Hassan*, 2021 WL 293255, at *6; *see also Lindner*, 2020 WL 7350212 (plaintiffs relied on course catalog to plead breach of implied contract). In contrast, as discussed, Botts's allegations go significantly beyond statements from a course catalog.  In any event, I find more persuasive the cases that have deemed the allegations of a contract sufficient to survive a Rule 12(b)(6) motion.

In sum, the allegations are sufficient to support a claim that, at the very least, Johns Hopkins and plaintiff had an implied contract for in-person, on-campus instruction. *See Quinnipiac Univ.*, 2021 WL 1146922, at *10 (declining to dismiss breach of contract claim because allegation that Quinnipiac charges less for online degree programs in combination "with the parties' alleged

course of conduct allow the reasonable inference that the parties may have at least implicitly entered into a specific agreement for on-campus instruction"); *Emory Univ.*, 2021 WL 358391, at *6 ("Because implied contracts 'arise from nonverbal conduct of the parties,' the Defendant's customary practice of providing in-person instruction after the payment of tuition could plausibly give rise to an implied contract…."); *Rosado v. Barry Univ.*, 20-CV-21813-JEM, 2020 WL 6438684, at *3 (S.D. Fla. Oct. 30, 2020) (concluding that plaintiff's "allegations that [defendant] accepted $773 more per credit for in-person classes from [plaintiff], and actually provided in-person education to [plaintiff] until March 19, 2020, in the backdrop of numerous other documents referring to in-person classes and amenities, are sufficient to establish, at a minimum, an implied contract"). Accordingly, I shall deny defendant's Motion with respect to Count I.

### C. Unjust Enrichment

As noted, plaintiff has also sued for unjust enrichment. In Count II, Botts alleges that plaintiff and members of the classes "conferred a benefit" on Johns Hopkins by way of "monies paid" for tuition and fees. ECF 35, ¶ 82. And, she claims that Johns Hopkins unjustly retained the payments "even though it ceased providing the full education, experience, and services for which the tuition and fees were collected," *id.* ¶ 84, and it substituted "online education services" with a "substantially lesser value." *Id.* ¶ 85.

A contract implied-in-law, known as a "quasi-contract," or unjust enrichment, is a "[l]egal fiction invented by common law courts to permit recovery by contractual remedy in cases where, in fact, there is no contract, but where circumstances are such that justice warrants a recovery as though there had been a promise." *Maryland Cas. Co.*, 442 Md. at 707, 114 A.3d 676 at 689 (emphasis and citations omitted); *see AAC HP Realty, LLC v. Bubba Gump Shrimp Co.*, 243 Md. App. 62, 70-71, 219 A.3d 99, 104 (2019); *Mohiuddin*, 196 Md. App. at 449, 9 A.3d at 865 (quoting Restatement (Second) of Contracts, § 4 (1981)); *Dashiell*, 358 Md. at 96-97, 747 A.2d at 607

(Unjust enrichment is a remedy "'to provide relief for a plaintiff when an enforceable contract does not exist but fairness dictates that the plaintiff receive compensation for services provided.'") (internal citation omitted). "A successful unjust enrichment claim serves to 'deprive the defendant of benefits that in equity and good conscience he ought not to keep, even though he may have received those benefits quite honestly in the first instance, and even though the plaintiff may have suffered no demonstrable losses.'" *Hill*, 402 Md. at 295–96, 936 A.2d at 352 (citation omitted); *see also Berry & Gould, P.A. v. Berry*, 360 Md. 142, 151, 757 A.2d 108, 113 (2000).

In Maryland, a claim of unjust enrichment is established when: "(1) the plaintiff confers a benefit upon the defendant; (2) the defendant knows or appreciates the benefit; and (3) the defendant's acceptance or retention of the benefit under the circumstances is such that it would be inequitable to allow the defendant to retain the benefit without the paying of value in return." *Benson v. State*, 389 Md. 615, 651-52, 887 A.2d 525, 546 (2005) (citation omitted); *see also Hill v. Cross Country Settlements, LLC*, 402 Md. 281, 295, 936 A.2d 343, 351 (2007); *Dashiell*, 358 Md. at 95 n.7, 747 A.2d at 607 n.7; *Jackson v. 2109 Brandywine, LLC*, 180 Md. App. 535, 574, 952 A.2d 304, 327, *cert. denied*, 406 Md. 444, 959 A.2d 793 (2008); *Swedish Civil Aviation Admin. v. Project Mgmt. Enterprises, Inc.*, 190 F. Supp. 2d 785, 792-93 (D. Md. 2002). The "'burden is on the plaintiff to establish that the defendant holds plaintiff's money and that it would be unconscionable for him to retain it.'" *Bank of America Corp. v. Gibbons,* 173 Md. App. 261, 268, 918 A.2d 565, 569 (2007) (quoting *Plitt v. Greenberg*, 242 Md. 359, 364, 219 A.2d 237, 241 (1966)).

Of relevance here, under Maryland law "a claim of unjust enrichment, which is a quasi-contract claim, may not be brought where the subject matter of the claim is covered by an express contract between the parties." *Janusz v. Gilliam*, 404 Md. 524, 537, 947 A.2d 560, 567 (2008)

(internal quotation marks omitted); *see Dashiell*, 358 Md. at 101, 747 A.2d at 610 ("We hold that, generally, quasi-contract claims such as quantum meruit and unjust enrichment cannot be asserted when an express contract defining the rights and remedies of the parties exists."); *FLF, Inc. v. World Publications, Inc.*, 999 F. Supp. 640, 642 (D. Md. 1998) ("It is settled law in Maryland, and elsewhere, that a claim for unjust enrichment may not be brought where the subject matter of the claim is covered by an express contract between the parties."); *Bubba Gump Shrimp Co.*, 243 Md. App. at 70-71, 219 A.3d at 104 (recognizing that "'no quasi-contractual claim can arise when a contract exists between the parties concerning the same subject matter on which the quasi-contractual claim rests'") (citation omitted). Generally, when an enforceable contract exists, courts "allow unjust enrichment claims only when there is evidence of fraud or bad faith,[] there has been a breach of contract or a mutual rescission of the contract, when rescission is warranted,[] or when the express contract does not fully address a subject matter.[]" *Dashiell*, 358 Md. at 100, 747 A.2d at 608-09.

In moving to dismiss this claim, Johns Hopkins argues that plaintiff cannot plead unjust enrichment in the alternative because she has not alleged that the University acted fraudulently or in bad faith. ECF 42-1 at 21-22. However, although a plaintiff "may not recover under both contract and quasi-contract theories, [she] is not barred from pleading these theories in the alternative where the existence of a contract concerning the subject matter is in dispute." *Swedish Civil Aviation Admin.*, 190 F. Supp. 2d at 792 (holding that "[u]ntil an express contract is proven, a motion to dismiss a claim for promissory estoppel or unjust enrichment on these grounds is premature" and permitting the plaintiff to plead "both contract and quasi-contract claims in the alternative") (internal citations omitted). And, she need not plead fraud or bad faith in order to do so.

Johns Hopkins disputes the existence of a valid contract for in-person education.  It is too early to determine whether plaintiff is likely to prevail on her contract claim.  Therefore, it would be premature to bar plaintiff from pursuing her alternative claim of unjust enrichment.  *See CDC-LCGH, LLC v. Mayor*, 313 F. App'x 637, 641-42 (4th Cir. 2009) (finding that the plaintiff was permitted to plead contract claims and quasi-contract claims in the alternative but, on motion for summary judgment, the unjust enrichment claim failed because the defendant had proven the existence of a valid, governing contract); *First Flight Ltd. P'ship v. All. Tech. Grp., LLC*, TDC-18-0720, 2019 WL 343250, at *3 (D. Md. Jan. 28, 2019) (noting that "to the extent that the existence of a valid contract remains in dispute, dismissal of a quasi-contract claim such as unjust enrichment may not be warranted"); *see also, e.g.*, *Quinnipiac*, 2021 WL 1146922, at *10-11 (finding that, "in light of the parties' dispute as to the existence of an enforceable contract, dismissal of the Plaintiffs' unjust enrichment claim is inappropriate at this juncture"); *Bradley Univ.*, 2020 WL 7634159 ("Especially since the existence of the underlying contract is in dispute, it would be premature for the Court to dismiss Plaintiff's unjust enrichment claim pled in the alternative to her breach of contract claim.").

Hopkins also argues that plaintiff's unjust enrichment claim fails because she has not adequately alleged that Hopkins profited "by moving class to a virtual setting" and thus failed to allege a benefit conferred on defendant that would be inequitable for it to retain. ECF 42-1 at 21-22. In response, plaintiff alleges that she paid for in-person instruction and an on-campus experience, which she did not receive. ECF 43 at 20 (citing ECF 35, ¶¶ 84-86). Further, she posits that the tuition she paid for in-person instruction "exceeds the value of the online education she is receiving now, based in part on Defendant's own significantly lower pricing for on-line education…." ECF 43 at 20 (citing ECF 35, ¶¶ 52-55).

As with the contract claim, the question is not whether Johns Hopkins was justified in moving its classes online.  Rather, the issue is whether Hopkins is entitled to retain tuition that it collected, despite the alleged promise to deliver in-person, on-campus instruction.  *See Stephens*, 2021 WL 1186341, at *5 (finding allegation that school promised in-person, on-campus instruction, but failed to deliver on promise and kept the tuition sufficient to infer the school "has unjustly retained the tuition and fees for which" student paid).

Moreover, even if plaintiff received a substantial benefit from her tuition payments, a motion to dismiss tests the sufficiency of the pleading, not the merits of the case.  The "question of whether the institution was unjustly enriched by retaining [Botts's] tuition—which allegedly encompassed the costs of delivering in-person instruction and all of the attendant benefits that flow from it—is a question improper for resolution on a motion to dismiss." *Quinnipiac*, 2021 WL 1146922, at *11.

I am satisfied that plaintiff has pleaded sufficient facts to withstand dismissal of her unjust enrichment claim. *See, e.g., McCarthy*, 2021 WL 268242 (denying motion to dismiss unjust enrichment claim); *Chong*, 2020 WL 7338499, at *4; *Bergeron*, 2020 WL 7486682, at *9; *Ford*, 2020 WL 7389255, at *8-9; *Salerno*, 488 F. Supp. 3d at 1218.

### D.  Consumer Protection Act

In Count III, plaintiff claims that Johns Hopkins engaged in unfair or deceptive trade practices under MCPA, C.L. §§ 13-301(1), (2) and (9). In particular, she claims that Johns Hopkins violated C.L. §§ 13-301(1), 2(i), and 2(iv) "by falsely representing and passing off to Plaintiff and class members that online education has the same value as in-person education." ECF 35, ¶ 90. Plaintiff also alleges that the University "intended that Plaintiff and class members rely on its implicit misrepresentation, through its failure to adjust tuition, and explicit misrepresentations, as

to the quality of its online classes as a substitute for in-person education," in violation of C.L. §

13-301(9)(i). *Id.* ¶ 91.

In relevant part, C.L. § 13-301 provides:

Unfair, abusive, or deceptive trade practices include any:

(1) False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

\* \* \* \*

(2) Representation that:

(i) Consumer goods, consumer realty, or consumer services have a sponsorship, approval, accessory, characteristic, ingredient, use, benefit, or quantity which they do not have;

\*\*\*\*

(iv) Consumer goods, consumer realty, or consumer services are of a particular standard, quality, grade, style, or model which they are not;

\*\*\*\*

(9) Deception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that a consumer rely on the same in connection with:

(i) The promotion or sale of any consumer goods, consumer realty, or consumer service[.]

Maryland courts consider two components in analyzing whether a statement violates C.L.

§ 13-301(1).  A misrepresentation "falls within the scope of C.L. § 13-301(1) if it is 'false' or

'misleading' *and* it has 'the capacity, tendency, or effect of deceiving or misleading' consumers."

*McGraw v. Loyola Ford, Inc.*, 124 Md. App. 560, 577, 723 A.2d 502, 510 (emphasis in original),

*cert. denied*, 353 Md. 473, 727 A.2d 382 (1999).

Whether a statement is "misleading" is judged in Maryland from the point of view of a

reasonable but unsophisticated consumer.  *See Luskin's, Inc. v. Consumer Protection Div.*, 353

Md. 335, 356-57, 726 A.2d 702, 712 (1999).  In assessing the "capacity, tendency, or effect" of a

statement to deceive or mislead, courts consider whether "a significant number of unsophisticated

37

consumers would find [the] information [at issue] important in determining a course of action." *Green v. H & R Block, Inc.*, 355 Md. 488, 524, 735 A.2d 1039, 1059 (1999).

Put another way, a court should ask whether the information is "'important to consumers and, hence, likely to affect their choice.'" *Luskin's*, 353 Md. at 359, 726 A.2d at 713 (citation omitted). In this respect, a statement "cannot be viewed in a vacuum"; rather, it must be viewed in the context in which it was made, along with other representations to the consumer. *McGraw*, 124 Md. App. at 580, 723 A.2d at 511.

The parties argue over whether plaintiff's MCPA claims are subject to the heightened pleading standard under Fed. R. Civ. P. Rule 9(b). *See* ECF 43 at 23; ECF 44 at 20-22. But, this disagreement is irrelevant because plaintiff fails to satisfy even the minimum pleading standard under Rule 8.

The Amended Complaint does not allege any false representations or misrepresentations on the part of Johns Hopkins that "online education has the same value as in-person education." And, a complaint does not "suffice if it tenders naked assertions devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (2009) (internal quotations omitted).

Moreover, a reasonable student could not consider himself or herself "deceived" or "misled" where the "school's normal course of on-campus instruction was altered mid-semester by an unforeseen global pandemic." *Bergeron*, 2020 WL 7486682, at *11 ("Whatever the merit of Plaintiffs' breach of contract or unjust enrichment claims, there is nothing in the complaint that plausibly alleges that RIT's publications would lead a reasonable prospective student to believe that the institution would so risk student safety and defy the Governor's orders."); *see Ford*, 2020 WL 7389155, at *10 ("No reasonable consumer would expect a university to remain open for in-

class instruction in the face of a pandemic and a state-mandated shutdown, regardless of whether the school advertised on-campus learning as a strength.").

Accordingly, I conclude that plaintiff has failed to state a claim that the University engaged in unfair or deceptive trade practices.  *See, e.g.*, *In re Columbia Tuition Refund Action*, 2021 WL 790638, at *10; *Espejo*, 2021 WL 810159, at *9; *Bergeron*, 2020 WL 7486682, at *11; *Ford*, 2020 WL 7389155, at *10.

### IV.    Conclusion

For the foregoing reasons, the Motion (ECF 42) is granted in part and denied in part.  An Order follows, consistent with this Memorandum Opinion.


Date: April 21, 2021                              _____/s/_____
                                                           Ellen L. Hollander
                                                           United States District Judge